**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | ) )  **CRIMINAL NO.** _____ |
|  | ) |
| **Plaintiff,** | )  **INDICTMENT** |
|  | ) |
| **v.** | )  **18 U.S.C. §§ 1505, 2** |
|  | )  **(Obstruction of Proceedings: Count 1)** |
| **DAVID G. BOWSER,** | ) |
|  | )  **18 U.S.C. §§ 641, 2** |
| **Defendant.** | )  **(Theft of Government Property: Count 2)** |
|  | ) |
|  | )  **18 U.S.C. §§ 1001(a)(1) & (c)(2), 2** |
|  | )  **(Concealment of Material Facts: Count 3)** |
|  | ) |
|  | )  **18 U.S.C. §§ 1001(a)(2) & (c)(2), 2** |
|  | )  **(False Statement:  Counts 4, 5, 6, 7, 8)** |

**INDICTMENT**

**THE GRAND JURY CHARGES:**

Unless otherwise indicated, at all times relevant to this Indictment:

**Background**

1.      From approximately 2008 until approximately January 2015, defendant DAVID

G. BOWSER was the Chief of Staff for a United States Congressman ("Congressman A") in the

United States House of Representatives ("House").  During that time, BOWSER also worked on

behalf of Congressman A's political campaigns, including Congressman A's House reelection

campaign in 2012 and Senate campaign in 2013 and 2014.

1

2.      In his official capacity as Chief of Staff for Congressman A's congressional office in the District of Columbia, BOWSER exercised authority and control over the hiring of congressional personnel for Congressman A's office and the expenditure of congressional funds, which are U.S. government funds, on behalf of Congressman A's office.

3.      In his capacity as a member of Congressman A's House and Senate campaign teams, BOWSER exercised authority and control over the hiring of staff for Congressman A's campaigns and the expenditure of campaign funds on behalf of Congressman A's campaigns.

4.      From approximately July 2007 until approximately January 2015, Congressman A was a Member of the United States House of Representatives.  During this time, Congressman A represented a congressional district in the State of Georgia.

5.      During various time periods from approximately February 2011 until December 2014, "Person A," "Person B," "Person C," and "Person E" worked for Congressman A's congressional office and also on behalf of Congressman A's House reelection campaign in 2012 and/or his Senate campaign in 2013 and 2014.

6.      From approximately 2008 until approximately May 2015, "Person D" was the pollster for Congressman A's campaigns for reelection to the House and for election to the Senate, except for a brief period of time in approximately December 2012 to approximately January 2013.

7.      Brett O'Donnell served as a paid consultant who assisted legislators, candidates, campaigns, and politicians, including Members of the United States Congress, among others, with their public speaking, debate performances, messaging, interactions with media, and communications strategies.

8.    "Congresswoman A" was a member of the House in 2012.

9.    Congressionally appropriated funds must be used for official, congressional purposes, and cannot be used in furtherance of a Member's political campaign or to pay for any campaign-related expenses.

10.   The Office of Congressional Ethics ("OCE") is an independent, non-partisan office established by the House to aid it in maintaining high ethical standards. On behalf of the House, OCE reviews and investigates allegations of misconduct against House Members, officers, and staff, and reports its findings to the OCE Board, which, in turn, may refer matters to the House Committee on Ethics.

### Congressman A's Retention of O'Donnell and O'Donnell's Services From June 2012 Through August 2012

11.   Congressman A's House reelection campaign in 2012 included a primary election for his party's nomination on or about July 31, 2012.

12.   Beginning in or about March 2012, BOWSER, Congressman A, and other members of Congressman A's campaign team began to discuss hiring a consultant or consultants who could provide (a) media consulting, such as developing television or radio advertisements, and (b) messaging consulting, such as helping with campaign speeches, media interviews, and debate preparation. As a result, BOWSER began soliciting proposals from consultants who could provide Congressman A's campaign with either media consulting or messaging consulting, or both.

13.     On or about April 18, 2012, BOWSER sent an e-mail from his personal e-mail account to members of Congressman A's campaign team that stated the following: "Gentlemen, attached is a one-page spreadsheet (don't get to excited [redacted name]!) as an overview of the consultants we met with regarding media consulting and communications training for the Congressman.  Some do only one part of this equation, others offer both.  I put down the consultant, their firm, services pitched, and proposal costs.  I am hoping to get the Congressman to decide this week what he wants as our next step."  BOWSER then attached a spreadsheet listing the names of several individuals who provide media consulting, message consulting, or both.

14.     On or about May 22, 2012, O'Donnell sent BOWSER an e-mail stating that Congressman A had inquired about O'Donnell helping him with his media interview performance, and O'Donnell was interested in talking with BOWSER and Congressman A about that possibility.

15.     On or about May 23, 2012, BOWSER responded to O'Donnell's e-mail by writing back, from his House e-mail account, to schedule O'Donnell for a meeting on May 31, 2012 with BOWSER, Congressman A, and Person A at the headquarters in the District of Columbia of the national campaign committee that supports the reelection of House Members of the political party to which Congressman A belongs ("party campaign headquarters").

16.     On or about May 31, 2012, in a meeting at the party campaign headquarters, O'Donnell interviewed with BOWSER, Congressman A, and Person A for a consulting position.

4

17.    On or about June 1, 2012, O'Donnell e-mailed a "Proposal for Communication/Media Assistance" to BOWSER, Congressman A, and Person A that stated, among other things, that O'Donnell could assist Congressman A "with messaging, and other strategic communication campaign or official activities." The proposal listed the four categories of services O'Donnell was offering, with examples in each category, including (1) "Media/Public Speaking/Debate Preparation;" (2) "Message Strategy and Media Preparation;" (3) "Debate Preparation," which included such things as "Written Analysis of all candidates," and "'Turn Key,' comprehensive debate preparation;" and (4) "Argument Consultation and Speechwriting," which included such things as "Argument strategies that account for the candidate's entire vision." The proposal provided an eight-point plan for how O'Donnell would help Congressman A improve, including as its first and second points, "1) Begin weekly one hour meetings to work on identifying communication weaknesses and strengths[;]" and "2) Work on improving those identified weaknesses through practice and other activities to build increased communication competence in those weekly meetings." The proposal stated, "I usually work on a monthly retainer. I would suggest a fee of 2,500.00 (plus expenses) for a monthly retainer."

18.    On or about June 8, 2012, in another meeting at the party campaign headquarters, O'Donnell again interviewed with BOWSER, Congressman A, and Person A. During the meeting, BOWSER, O'Donnell, Congressman A, and Person A discussed the possibility of O'Donnell assisting Congressman A with his ongoing House reelection campaign, including helping Congressman A prepare for an upcoming campaign debate scheduled to occur on or about June 22, 2012.

19. On or about June 12, 2012, O'Donnell e-mailed Person A and stated, "Excited to be working for [Congressman A] and with your team." O'Donnell then requested the information for Congressman A's scheduler because O'Donnell "wanted to get times set up for next week." O'Donnell added that he would "also like to get video of this week's debate as soon as possible." Person A wrote back later that same day to provide O'Donnell the contact information for the Congressman's scheduler, and she also explained that, "We ended up cancelling this weeks' debate . . . the first one will be June 22nd on tv in Macon. I'm excited to work for you too!" (ellipses in original).

20. Later on or about that same day, June 12, 2012, O'Donnell e-mailed Congressman A's scheduler, writing, "I'd like to schedule two sessions with [Congressman A] next week since he has a debate on June 22 . . . . I'd like to make sure we have one on the 21st since his debate is on the 22nd." On or about that same day, O'Donnell also e-mailed Person A, stating, "It would be helpful if you can find any video (or online links) of [Congressman A] debating as I want to spend some time with him next week prepping him for the debate on the 22nd."

21. On or about June 14, 2012, BOWSER used his House e-mail account to e-mail Congressman A's congressional staffers, with the e-mail copied to several persons involved in Congressman A's campaign including Person D and a campaign fundraiser, to announce O'Donnell's hiring "as a communications and messaging consultant to our official office." Later that same day, BOWSER sent an e-mail from his House e-mail account to O'Donnell in order to confirm O'Donnell's availability to help prepare Congressman A for the June 22 campaign debate. BOWSER wrote:

Brett,

As we discussed last week, there was a potential for a debate which has now turned into a scheduled event on June 22nd on television from 9:30 – 10:30 am in studio.  We are in session next week with last votes no later than Thursday, June 21st at 3pm.  The Congressman would like to schedule a couple of hours later that afternoon for debate preparations so we are going to hold from 3-6pm on our schedule and secure a conference room at the [party campaign headquarters] for this purpose.  Please let me know if we can plan on you attending some or all of this prep time.

Thanks!
David

O'Donnell responded by e-mail a few minutes later that he was available for the meeting.

22.     Additionally, on or about that same day, June 14, 2012, BOWSER telephoned a consultant who is a direct competitor of O'Donnell's in the business of campaign messaging, communications, and debate consulting, and who had been listed on the spreadsheet of consultants BOWSER had provided to members of Congressman A's campaign team in the e-mail he sent on or about April 18, 2012 (discussed above in paragraph 13), and informed the consultant that he would not be hired to provide services to Congressman A.

23.     On or about June 19, 2012, O'Donnell e-mailed BOWSER a proposed consulting contract between himself and "'[Congressman A]' (the 'Client'), located at _____."  In the text of the e-mail to which the proposed contract was attached, O'Donnell wrote, among other things, "I wasn't sure that you settled on how I would be paid so I left the address blank[.]"

24.    On or about June 21, 2012, O'Donnell and BOWSER, on behalf of Congressman A's congressional office, finalized and executed an initial, written contract relating to O'Donnell's services. That initial contract stated that it began on June 16, 2012 and expired on August 3, 2012. This expiration date was three days after the July 31, 2012 primary election for Congressman A. The same day that the contract was executed, O'Donnell attended a debate preparation session in which he assisted Congressman A in preparing for the June 22 campaign debate.

25.    On or about June 22, 2012, the day of the campaign debate, O'Donnell e-mailed Congressman A several debate performance reminders.

26.    On or about July 2, 2012, Congressman A participated in a second campaign debate. Prior to the event, O'Donnell assisted Congressman A in preparing for the debate.

27.    On or about July 14, 2012, Congressman A participated in a campaign forum with his opponent in his primary election. Prior to the event, O'Donnell assisted Congressman A in preparing for the forum.

28.    In or about July 2014, O'Donnell provided assistance to Congressman A's primary election campaign in addition to debate preparation, such as making recommendations to the campaign manager about what to say at a campaign event at which the manager appeared.

29.    In or about July 2014, Congressman A won his party's nomination for the House. Several months later, in or about November 2012, Congressman A was reelected to serve as a United States Representative.

30.     For the approximately six weeks of work O'Donnell provided to Congressman A

from approximately June 2012 to approximately August 2012 – which included substantial

campaign-related work – Congressman A's office, at BOWSER's direction, paid O'Donnell

approximately $3,750 in U.S. government/congressional funds.  O'Donnell was not paid by the

campaign for his time and work associated with Congressman A's House reelection campaign in

2012.

### Congressman A's Retention of O'Donnell and O'Donnell's Services From September 2012 Through December 2012

31.     On or about September 12, 2012, O'Donnell sent BOWSER an e-mail with a draft

of a renewed consulting contract.  On or about September 13, 2012, BOWSER wrote an e-mail

back to O'Donnell, stating, "Can I pay you in karma?  If not, can I change the terms to half due

on September 15th and other half due on November 15th?"  O'Donnell wrote back, "I don't take

foreign currency," in reference to BOWSER's apparent joke about whether O'Donnell would

accept "karma," rather than money, for the services he was providing Congressman A, and wrote

that he agreed to the modified payment schedule BOWSER requested.  O'Donnell then e-mailed

a contract back to BOWSER reflecting the requested payment date changes.

32.     In or about September 2012, O'Donnell and BOWSER, on behalf of

Congressman A's congressional office, executed a second written contract relating to

O'Donnell's services.  That second contract covered the period from September 1, 2012 to

December 31, 2012 for a total compensation amount of $3,750, and stated that it would proceed

to a month-to-month contract after that date at a rate of $2,500 per a month.

33.     Having secured reelection to the House, Congressman A began exploring a run

for the United States Senate, which BOWSER took the lead in organizing in or about December

2012.

34.     On or about December 19, 2012, BOWSER sent an e-mail from his personal e-mail account to members of Congressman A's campaign team, including O'Donnell, in which he introduced two new campaign team members.  BOWSER then explained the role of each of the members of the pre-existing campaign team, including that, "Brett O'Donnell is Congressman [A]'s messaging consultant and media prep advisor."

35.     For the period between approximately September 2012 and approximately December 2012, Congressman A's office, at BOWSER's direction, paid O'Donnell approximately $3,750.  O'Donnell was not paid by the campaign for his time and work associated with Congressman A in this time frame.

## Congressman A's Retention of O'Donnell and O'Donnell's Services From January 2013 Through December 2013

36.     In or about January 2013, BOWSER and O'Donnell negotiated another contractual agreement wherein O'Donnell agreed to provide consulting services to Congressman A.  BOWSER, on behalf of Congressman A, and O'Donnell orally agreed that O'Donnell would serve Congressman A on a month-to-month basis and that Congressman A's congressional office would pay O'Donnell a monthly salary of approximately $2,500 in U.S. government/congressional funds.

37.     On or about February 6, 2013, Congressman A publicly announced his candidacy for Senate.  The day before the announcement, on or about February 5, 2013, BOWSER sent an e-mail from his personal e-mail account to Congressman A, O'Donnell, Person A, and other members of the campaign team, stating, among other things, "There are 2 – TWO – things only that we care about with this announcement:  1) It is delivered well and looks like it [and] 2) what is the story and main theme we want printed?  The first is Brett and [Person A]'s job."

38.     In or about early 2013, O'Donnell asked BOWSER about receiving financial compensation from Congressman A's Senate campaign for all of the work O'Donnell would be providing to the campaign. BOWSER told O'Donnell that the campaign could not afford to pay him for his services, but that O'Donnell should hang on until after the Senate party primary election in May 2014.

39.     In or about February 2013, BOWSER invited O'Donnell to travel to Georgia to attend a planning meeting for Congressman A's Senate campaign. O'Donnell attended the campaign-related meeting, but did not attend a congressional employee retreat for Congressman A's official staff that also was held in Georgia around that same time. The approximately $838.75 in travel costs, such as for airfare and accommodations, that O'Donnell incurred for his trip to Georgia for the campaign-related meeting were reimbursed, at BOWSER's direction, using Congressman A's Senate campaign funds. O'Donnell was not paid by the campaign for his time and work associated with this trip to Georgia.

40.     Throughout the year 2013, and in addition to any official services he performed for Congressman A, O'Donnell provided substantial services to Congressman A's Senate campaign. Among the services that he provided to the Senate campaign, O'Donnell reviewed and edited Congressman A's speech announcing his candidacy for the Senate; helped Congressman A practice the delivery of his speech to his political party's convention; assisted Congressman A in drafting and practicing speeches he could give during his Senate campaign events; advised Congressman A's wife regarding appearances and messaging for Congressman A's Senate campaign; helped to negotiate the format for upcoming campaign debates in which Congressman A would be participating; helped to prepare Congressman A for campaign-related

interviews and appearances; and participated in campaign-related conference calls with BOWSER and other staffers and consultants.

41.     BOWSER remained aware of O'Donnell's role in the campaign throughout this time frame and continued to direct his campaign activities. For example, on April 4, 2013, at approximately 12:18 a.m., O'Donnell sent an e-mail to BOWSER and other members of the campaign team, stating, "Attached is the 10 minute stump [speech] that [Congressman A] asked me to write. I wanted to send it around and get your edits and approval before sending it to [Congressman A]." O'Donnell's e-mail attached a draft speech for Congressman A's Senate campaign. Several days later, on April 10, 2013, at approximately 5:09 p.m., Person D, the pollster for Congressman A's Senate campaign, replied to O'Donnell's earlier e-mail with a separate e-mail sent to BOWSER and another member of the campaign team that stated, "This is a ten minute speech? . . . . I think we need a major re-write. . . . What happened to the message guy?" A few minutes later, at approximately 5:16 p.m., BOWSER replied to Person D, using his personal e-mail account, stating, "The speech was written by the message guy . . . Brett [O'Donnell] is good at helping [Congressman A] deliver the message, stick to the message, and handle questions/interviews, but writing the message is a whole different thing. We are on it."

42.     On or about December 5, 2013, Person B sent BOWSER an e-mail asking whether to agree to Congressman A participating in a series of interviews that a radio program was holding with each of the Georgia Senate candidates. BOWSER responded in an e-mail that same day from his personal e-mail account, stating, "Yes, but I want heavy Brett [O'Donnell] time before hand . . ." In response, O'Donnell exchanged a series of e-mails with Person B to schedule an opportunity to prepare Congressman A for the interview.

43.     Additionally, throughout 2013, O'Donnell participated in approximately one-hour long sessions on approximately a weekly basis with Congressman A in his congressional office, with BOWSER and other staff sometimes in attendance, in which O'Donnell, Congressman A, and others present, discussed messaging and communications, including messaging and communications regarding Congressman A's Senate campaign. BOWSER was aware that these regular sessions in the congressional office included campaign discussions, and directed their content on some occasions. For example, on or about June 5, 2013, BOWSER, using his personal e-mail account, sent an e-mail to O'Donnell, copied to other members of the campaign team, that complained about "how awkwardly [Congressman A] is handling the 'electability' question" regarding his likelihood of winning election to the Senate, and added, "I think we need to focus in on this with him during next Thursday's session." O'Donnell e-mailed back that same day, June 5, 2013, stating, among other things, "I will speak to him about this on Thursday (we talked about it yesterday so I'm a bit surprised by what happened)."

44.     In or about late 2013, O'Donnell again asked BOWSER about receiving financial compensation from Congressman A's Senate campaign for all of the work O'Donnell was providing to the campaign. BOWSER again told O'Donnell that the campaign could not afford to pay him for his services, but that O'Donnell should hang on until after the Senate party primary election in May 2014. O'Donnell believed by this time that BOWSER and Congressman A expected him to consult on Congressman A's Senate campaign, and that if he refused to provide consulting services to Congressman A in support of his Senate campaign, BOWSER, on behalf of Congressman A's office, would terminate O'Donnell's month-to-month work arrangement with the office and end his monthly payments with U.S. government/congressional funds.

## July 2013 Media Attention Regarding O'Donnell's Services, Questions by the Campaign Team about O'Donnell's Payment, and BOWSER's Responses

45.     On or about Tuesday, July 23, 2013, the national newspaper *USA Today*

published an article describing how several Members of Congress, including Congressman A,

paid O'Donnell with U.S. government/congressional funds for "training," explained O'Donnell's

background as a campaign debate consultant, and noted "Members [of Congress] are required to

separate political and official expenses and can't use their office accounts to pay for political

activity."

46.     The next day, Wednesday, July 24, 2013, at approximately 6:45 p.m., Person E

sent an e-mail to BOWSER and other members of Congressman A's campaign team with the

text of the *USA Today* article. A series of e-mails were exchanged and a conference call was

held that evening between members of the campaign team in which they sought to determine

more information about how O'Donnell actually was being paid and how to respond. On that

same day, BOWSER was away from the office, so he did not respond regularly to this series of

e-mails or participate in the conference call. He did write one e-mail from his personal e-mail

account, at approximately 7:37 p.m., stating: "Apologies as I am at a loud outdoor venue right

now and cannot call in . . . but as far as I am concerned, there is nothing to this story and in my

opinion we came out clean by not responding or answering. [Congresswoman A's] people are

the ones who gave the story legs." Despite his general unavailability, members of Congressman

A's campaign team continued to e-mail BOWSER that evening (sometimes copying other

members of the campaign team and sometimes just communicating solely with BOWSER) in

order to provide him information about the situation and request he contact them.

47.     For example, at approximately 8:00 p.m., Person B wrote an e-mail to BOWSER

stating the following: "Everyone seemed to be pretty concerned about [Congressman A's]

violation of trust of the American people to use taxpayer dollars to fund these services. Brett

[O'Donnell] came in today and we all discussed how [Congressman A] would respond, and I

thought he had a solid response."

48.     At approximately 8:18 p.m., Person D wrote an e-mail to BOWSER and other

members of the campaign team stating the following: "The congressman is under the impression

that both the official office and the campaign have paid this individual. Please call [Person E] at

the earliest possible time. He is conducting an audit[.] We need to have all of this tied up by

9am. The Congressman should not comment to anyone until that time. We need a statement

eventually about adhering to the highest ethical standard and I would prefer that it not be used

until pushed. Again, please call [Person E]."

49.     At approximately 9:19 p.m., Person D wrote another e-mail to BOWSER and

other members of the campaign team stating the following: "After speaking with the

congressman again tonight, it would appear that this situation is a little more involved than I

understood. I would ask that everyone complete their assignments and that we all convene on a

conference call in the early afternoon on Thursday [July 25, 2013]."

50.     At approximately 9:53 p.m., Person B wrote an e-mail to BOWSER that stated the

following: "Just to fill you in, Brett [O'Donnell] came in today and we both met with

[Congressman A] and talked about how we would respond to the story, if necessary. So far we

haven't received any requests, but we wanted to prepare just in case. I shared that response with

everyone on the conference call today as well. Today [Congressman A] said that he thought

Brett might be paid on both official and campaign. Do you know what the situation is? I talked

to [Congressman A] and he said he won't talk to anyone about the payment situation until we all discuss Tom[orrow] [sic]."

51.     The next day, Thursday, July 25, 2013, at approximately 11:31 a.m., Person D sent an e-mail to BOWSER and other members of the campaign team that provided the call-in information for a conference call scheduled for later that day to discuss the response to the *USA Today* article that Person D had attempted to coordinate the previous day. A few minutes later, at approximately 11:40 a.m., Person E sent an e-mail in response that stated the following: "[Person D], Please give me a call regarding this. I spoke to David [BOWSER] late last night after he spoke to [Congressman A]." Shortly thereafter, Person E sent an e-mail to BOWSER, Person D, and other members of the campaign team that notified them there would be no conference call that day.

52.     On or about August 7, 2013, at approximately 3:29 p.m., BOWSER used his personal e-mail account to send an e-mail to O'Donnell, and other members of Congressman A's campaign team informing them that a poll had just been completed for the Senate campaign and asking them to provide the address to which they would like Person D's polling firm to send the results. At approximately 4:32 p.m., O'Donnell replied to BOWSER's e-mail, copying the prior recipients, and provided his mailing address. Shortly thereafter, at 5:09 p.m., Person D wrote a separate e-mail only to BOWSER, asking the following: "Is Brett [O'Donnell] now being paid to be a part of the campaign? Is he still working on the official side?" At 5:14 p.m., BOWSER wrote an e-mail back to Person D, stating, "We can discuss on the phone later. We are fine on this." At 5:19 p.m., Person D wrote an e-mail back to BOWSER stating, "All things are 'discoverable.'" It appears that BOWSER did not respond to this e-mail in writing.

**Congressman A's Retention of O'Donnell and O'Donnell's Services**
**From December 2013 Through March 2014**

53.     From in or about at least December 2013 to March 2014, the vast majority of

O'Donnell's services to Congressman A focused on Congressman A's Senate campaign.  During

this time, a series of Senate party primary debates were held in Georgia.  Congressman A

participated in each of those campaign debates.  O'Donnell assisted Congressman A in preparing

for the debates, such as by preparing talking points for him on issues and methods of attacking

his opponents and also conducting debate preparation sessions.

54.     In or about mid-January 2014, O'Donnell traveled to Africa to perform charitable

work.

55.     On or about January 14, 2014, in advance of the first Senate campaign debate in

Adel, Georgia, BOWSER sent an e-mail to Person B, with O'Donnell included on it, stating,

"Since our debate consultant actually abandoned us on our first debate for a bunch of Ethiopians

who don't pay him, I may need to send you to Adel this weekend if you are able to go?"

56.     For the debate preparation session that he would be missing in or about January

2014, O'Donnell asked BOWSER if a paid campaign consultant that worked with O'Donnell

could stand in for O'Donnell and, for this one session, provide campaign debate consulting

services to Congressman A in O'Donnell's absence.  On or about January 9, 2014, BOWSER

used his House e-mail account to send an e-mail to O'Donnell informing him that Congressman

A had approved the substitute arrangement.  O'Donnell's business associate subsequently

provided Congressman A with campaign debate consulting services in advance of the first

Senate campaign debate.  O'Donnell later paid his associate for providing these consulting

services to Congressman A.

57.     On or around February 24, 2014, in the midst of the Senate campaign debate schedule, a member of Congressman A's Senate campaign team sent an e-mail to BOWSER, O'Donnell, and other members of the campaign team with a document attached, entitled "Post Debate Analogy and Forward Strategy." O'Donnell sent an e-mail in response to BOWSER and the other members of the campaign team in which he indicated his disagreement with the document's assessment of Congressman A's past and future debate performances.   Among other things, O'Donnell wrote: "You hired me to to [sic] coach the candidate.  I won't make ads, write mail pieces, manage the online program or the campaign, but lets [sic] trust each other to play the roles we were hired to do."

58.     For the work O'Donnell provided to Congressman A from approximately December 2013 to approximately March 2014 – the vast majority of which was related to Congressman A's Senate campaign – Congressman A's office, at BOWSER's direction, paid O'Donnell approximately $10,000 in U.S. government/congressional funds.  O'Donnell was not paid by the campaign for his time and work associated with Congressman A's Senate campaign in 2013 or 2014.

59.     In total, for the work O'Donnell provided to Congressman A from approximately June 2012 to approximately March 2014 – a substantial amount of which was related to Congressman A's House reelection campaign in 2012 and his Senate campaign in 2013 and 2014 – Congressman A's office, at BOWSER's direction, paid O'Donnell approximately $43,750 in U.S. government/congressional funds.  O'Donnell was not paid by either of Congressman A's campaigns for his time and work associated with Congressman A's House reelection and Senate campaigns.

## OCE's Investigation

60.     In or about March 2014, while Congressman A's Senate campaign was still ongoing, a television reporter attempted to interview Congressman A regarding O'Donnell's work for his campaign. Later that month, BOWSER met O'Donnell in Congressman A's congressional office and told O'Donnell that Congressman A's office was terminating its relationship with O'Donnell. Among other things, BOWSER told O'Donnell that his role with Congressman A's campaigns was as a "volunteer." That was the first time that BOWSER had told O'Donnell that he was a "volunteer" on Congressman A's campaigns.

61.     On March 25, 2014, BOWSER sent an e-mail to members of Congressman A's campaign team, with the subject line "Change of Team [Congressman A]," that stated, "I just wanted to let you know that Brett O'Donnell resigned his contract position with our official office this morning and is no longer on Team [Congressman A]. [Congressman A] reluctantly accepted Brett's resignation and we are all moving forward. [Person C] as part of protocol, we need to change the passwords to our private campaign Gmail, youtube, and picture library accounts."

62.     In or about late March 2014, OCE commenced an investigation into whether Congressman A's office had improperly used U.S. government/congressional funds to pay O'Donnell to provide campaign-related services to Congressman A. It was material to OCE's investigation to determine the full nature, scope, and purpose of services that O'Donnell provided to Congressman A's campaigns. As part of its investigation, OCE sent letters dated April 3, 2014 to Congressman A's office and O'Donnell, requesting they produce any records relating to O'Donnell and his services for the congressional office or Congressman A's campaigns.

63. On or about June 3, 2014, because it had not yet received any documents in response to its initial request to Congressman A's office, OCE sent written requests directly to several staffers associated with Congressman A's congressional office and his campaigns, including BOWSER, Person B, and Person C. The requests again asked for records relating to O'Donnell and his services. The request specifically sought, among other things, all records of "communications" regarding O'Donnell's services for Congressman A's congressional office and his campaigns, including "written letters, memoranda, emails, instant messages, records and memoranda to file, or any document memorializing or reflecting a meeting, conversation, or telephone call." OCE also sought to interview certain individuals associated with Congressman A's congressional office and campaigns.

## COUNT ONE
### 18 U.S.C. §§ 1505 and 2
### Obstruction of Proceedings

64. Paragraphs 1 to 63 of this Indictment are incorporated here by reference.

65. From in or about March 2014 through in or about June 2014, in the District of Columbia and elsewhere, defendant

### DAVID G. BOWSER

did knowingly and corruptly influence, obstruct, impede, and endeavor to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which an inquiry and investigation was then being had by the United States House of Representatives and a committee of the United States House of Representatives, that is, the official investigation being conducted by the Office of Congressional Ethics into the use of U.S. government/congressional funds by Congressman A's office to pay for Brett O'Donnell's services to Congressman A's House reelection and Senate campaigns.

66.     During the course of OCE's investigation, defendant BOWSER attempted to convince OCE that O'Donnell's services to Congressman A's campaign were minimal, that they were provided strictly on a "volunteer" basis, and that O'Donnell's compensation with U.S. government/congressional funds was entirely for O'Donnell's official work for Congressman A's congressional office.  BOWSER carried out the obstruction and endeavor to obstruct by, among other things:

a.  Delaying, preventing, and attempting to prevent witnesses from providing their own e-mails to OCE that showed the substantial work that O'Donnell performed for Congressman A's campaigns;

b.  Influencing and attempting to influence the testimony of other witnesses, including telling O'Donnell that OCE could "go f**k themselves," and providing witnesses with the cover story that O'Donnell's work for the campaigns was purely as a "volunteer";

c.  Failing to produce to OCE any of the numerous e-mails BOWSER sent or received on his personal e-mail account showing that O'Donnell performed substantial work for Congressman A's campaigns, and that O'Donnell began doing so from the very first day that he was hired; and

d.  Falsely stating to OCE that O'Donnell was hired purely to provide official services, and that Congressman A did not need his debate preparation and other campaign services.

Person B's E-mails

67.     In or about June 2014, in response to OCE's document request, Person B began to gather e-mails relating to O'Donnell from both her official House e-mail account and her personal Gmail account.  The majority of her e-mails regarding O'Donnell's services were contained in her personal e-mail account, because congressional staff are not permitted to use their official e-mail accounts for campaign activity.  After beginning her collection of official and personal e-mails, Person B asked BOWSER if they needed to provide personal e-mails to OCE.  BOWSER told Person B that they only had to provide their official House e-mails to OCE.  As a result of BOWSER's direction, Person B removed her personal e-mails from the production and did not provide them to OCE, even though many of them involved O'Donnell and his services to Congressman A's Senate campaign.

68.     While searching her official House e-mail account, Person B found several e-mails regarding O'Donnell's services to the campaign.  Person B asked BOWSER if she should produce those campaign-related e-mails to OCE.  BOWSER directed her to "use [her] discretion."  As a result of BOWSER's direction, Person B did not produce the campaign-related e-mails to OCE, and produced only e-mails relating to O'Donnell's services to the congressional office.

Person C's Documents

69.     On or about June 9, 2014, BOWSER e-mailed Person C and others, advising

them, among other things, that BOWSER had spoken to OCE and "told them that none of you

really had any relevant, direct conversations or interactions with Brett O'Donnell (to my

knowledge)" and that "[i]f that is indeed the case, then you won't need to turn over any

information (since you don't have anything outside of being on group e-mails that Brett was also

on) and they won't need to interview you."  BOWSER then directed Person C and others to send

a "note" to OCE stating that they did not have any relevant documents or communications with

O'Donnell.

70.     Although Person C did, in fact, have e-mail communications with O'Donnell and

others involving Congressman A's Senate campaign and campaign-related activities, as a result

of BOWSER's direction, Person C did not respond initially to OCE's request.

71.     In or about July 2014, BOWSER again e-mailed Person C, advising that Person C

was the only person who had not sent the letter to OCE that BOWSER previously suggested in

his June 9, 2014 e-mail and that Person C should do so.  Person C then contacted OCE directly to

inquire about its investigation and investigative authority.  As a result of his communications

with OCE, and contrary to BOWSER's direction, Person C produced his documents to OCE,

including e-mails involving O'Donnell and his services to Congressman A's Senate campaign.

Person B's OCE Interview

72.     In or around June 2014, BOWSER spoke with Person B in advance of her interview with OCE.  BOWSER told Person B that O'Donnell had served only in an official capacity but had volunteered on Congressman A's campaigns.  BOWSER also stated to Person B that campaign work had been performed outside of the congressional office, although O'Donnell, BOWSER, Person B, and others had, in fact, performed campaign work in the congressional office.

O'Donnell's OCE Interview

73.     On or about April 1, 2014, BOWSER used his personal e-mail account to send O'Donnell an e-mail regarding the OCE investigation.  In this e-mail, BOWSER again attempted to reinforce with O'Donnell the cover story that he had "volunteered" for Congressman A's Senate campaign, that he had not been initially hired to provide any political services, and that all his campaign activities had taken place outside of his congressionally-funded work and outside of the congressional office.  Specifically, BOWSER wrote:

> My point is this - someone tell me how this is any different than the phone vendor we use for tele-townhalls [sic] who also has a huge campaign client list, the mail firm we use for our official franked mail who also has a huge campaign client list, the accountant we pay every month to help with our budget who also does a lot of campaign & political compliance work, or even the campaign manager a new member makes into his chief of staff.  The more I think about it the more pissed off I get.  We hired you in an official capacity to help the Congressman improve his speaking abilities and as part of our communications team, nearly a year before there was even a Senate seat to run for, and you did a great job with him.  Any debate advice you wanted to give him on your own time, outside the official compound, has no bearing on the fact that we hired you to work in an official capacity and that's all we did with those funds, period.

74.     Between approximately May 1, 2014 and approximately June 23, 2014, BOWSER spoke with O'Donnell regarding the OCE investigation.  Among other things, BOWSER referred to the investigation as a "witch hunt" and told O'Donnell that OCE could "go f**k themselves."  BOWSER again told O'Donnell that he had been a "volunteer" on Congressman A's campaigns.

75.     On or about June 23, 2014, OCE interviewed O'Donnell.  As a result of BOWSER's direction, O'Donnell knowingly and intentionally made false statements to OCE in an effort to minimize, conceal, and cover up the true nature and scope of his work for Congressman A's campaigns, and to conceal interactions he had with BOWSER regarding O'Donnell's role with the campaigns.

BOWSER's E-mails

76.     Despite BOWSER using his personal e-mail account to exchange numerous e-mails with O'Donnell regarding Congressman A's House and Senate campaigns from 2012 to 2014, BOWSER did not provide a single e-mail to OCE from his personal e-mail account, notwithstanding OCE's request to him in its July 9, 2014 letter for all "communications," including "email" regarding O'Donnell's services to Congressman A's congressional offices or his campaigns.

77.     On or about June 9, 2014, BOWSER falsely signed a written certification form stating that he had not "knowingly and willfully withheld, redacted or otherwise altered any information requested in the Office of Congressional Ethics' ('OCE') Request for Information, dated [June 9, 2014], or if I have withheld, redacted or otherwise altered any requested information, then I have identified the information and why it was withheld, redacted or otherwise altered."

BOWSER's OCE Interview

78.     On or about June 24, 2014, in the District of Columbia, OCE interviewed BOWSER.  Prior to the interview, OCE advised BOWSER of his obligation to answer questions truthfully and that providing false statements is a crime.  BOWSER executed a form acknowledging that any false statements he made could be prosecuted under Title 18, United States Code, Section 1001.

79.     During his interview with OCE, BOWSER knowingly and willfully made several false statements to OCE in an effort to minimize, conceal, and cover up the true nature and scope of O'Donnell's work for Congressman A's campaigns and BOWSER's intent to hire O'Donnell to assist Congressman A's political campaigns.

80.     Among the false statements he made to OCE, BOWSER stated:

    a.   " . . . at no point did we ever entertain the idea this [O'Donnell's services] would be a political adventure.  This was purely on the official side.";

    b.   " . . . we went into it [relationship with O'Donnell] purely looking for nothing but official help.";

    c.   "We didn't need debate preparation."; and

    d.  "I mean, bottom line is this was done because [Congressman A] significantly needed help in his communicating ability and that's the only reason why it was done and, you know, we had no intention at all of doing anything on the political side with this."

All in violation of Title 18, United States Code, Sections 1505 and 2.

### COUNT TWO
18 U.S.C. §§ 641 and 2
Theft of Government Funds

81.     Paragraphs 1 to 80 of this Indictment are incorporated here by reference.

82.     From in or about June 2012 to in or about March 2014, in the District of

Columbia and elsewhere, defendant

### DAVID G. BOWSER

did embezzle, steal, purloin, and knowingly convert to the use of another more than $1,000 of

money of the United States, the United States House of Representatives, and the Office of

Congressman A, that is, BOWSER caused the United States, the United States House of

Representatives, and the Office of Congressman A to pay Brett O'Donnell for consulting

services that O'Donnell provided to Congressman A's House reelection and Senate campaigns.

All in violation of Title 18, United States Code, Sections 641 and 2.

### COUNT THREE
18 U.S.C. §§ 1001(a)(1) & (c)(2), and 2
Concealment of Material Facts

83.     Paragraphs 1 to 82 of this Indictment are incorporated here by reference.

84.     On or about June 24, 2014, in the District of Columbia and elsewhere, in a matter

within the jurisdiction of the legislative branch of the Government of the United States, and in

connection with an investigation and review conducted pursuant to the authority of a committee

and office of the United States Congress, consistent with applicable rules of the House of

Representatives, defendant

### DAVID G. BOWSER

did knowingly and willfully falsify, conceal, and cover up by trick, scheme, and device a

material fact, that is, during the course of an official investigation being conducted by the Office

27

of Congressional Ethics ("OCE"), defendant BOWSER intended to minimize and conceal the full nature, purpose, and extent of Brett O'Donnell's services for Congressman A's campaigns by, among other things:

    a. Influencing and attempting to influence the testimony of other witnesses, including telling O'Donnell that OCE could "go f**k themselves" and providing witnesses with the cover story that O'Donnell's work for the campaigns was purely as a "volunteer";

    b. Delaying, preventing, and attempting to prevent witnesses from providing their own e-mails to OCE that showed the substantial work that O'Donnell performed for Congressman A's campaigns;

    c. Failing to produce to OCE any of the numerous e-mails BOWSER sent or received on his personal e-mail account showing that O'Donnell performed substantial work for Congressman A's campaigns, and that he began doing so from the very first day that he was hired; and

    d. Falsely stating to OCE that O'Donnell was hired purely to provide official services, and that they did not need his debate preparation and other campaign services.

All in violation of Title 18, United States Code, Sections 1001(a)(1) & (c)(2), and 2.

## COUNT FOUR
18 U.S.C. §§ 1001(a)(2) & (c)(2), and 2
False Statement

85.     Paragraphs 1 to 84 of this Indictment are incorporated here by reference.

86.     On or about June 24, 2014, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, and in connection with an investigation and review conducted pursuant to the authority of a committee and office of the United States Congress, consistent with applicable rules of the House of Representatives, defendant

### DAVID G. BOWSER

did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation, that is, during the course of an official investigation being conducted by the Office of Congressional Ethics ("OCE"), defendant BOWSER made the following false and misleading statement regarding the full nature, purpose, and extent of Brett O'Donnell's services for Congressman A's campaigns: " . . . at no point did we ever entertain the idea this [O'Donnell's services] would be a political adventure. This was purely on the official side."

All in violation of Title 18, United States Code, Sections 1001(a)(2) & (c)(2), and 2.

## COUNT FIVE
18 U.S.C. §§ 1001(a)(2) & (c)(2), and 2
False Statement

87.     Paragraphs 1 to 86 of this Indictment are incorporated here by reference.

88.     On or about June 24, 2014, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, and in connection with an investigation and review conducted pursuant to the authority of a committee and office of the United States Congress, consistent with applicable rules of the House of Representatives, defendant

### DAVID G. BOWSER

did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation, that is, during the course of an official investigation being conducted by the Office of Congressional Ethics ("OCE"), defendant BOWSER made the following false and misleading statement regarding the full nature, purpose, and extent of Brett O'Donnell's services for Congressman A's campaigns: " . . . we went into it [relationship with O'Donnell] purely looking for nothing but official help."

All in violation of Title 18, United States Code, Sections 1001(a)(2) & (c)(2), and 2.

## COUNT SIX
18 U.S.C. §§ 1001(a)(2) & (c)(2), and 2
False Statement

89.     Paragraphs 1 to 88 of this Indictment are incorporated here by reference.

90.     On or about June 24, 2014, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, and in connection with an investigation and review conducted pursuant to the authority of a committee and office of the United States Congress, consistent with applicable rules of the House of Representatives, defendant

### DAVID G. BOWSER

did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation, that is, during the course of an official investigation being conducted by the Office of Congressional Ethics ("OCE"), defendant BOWSER made the following false and misleading statement regarding the full nature, purpose, and extent of Brett O'Donnell's services for Congressman A's campaigns:  "We didn't need debate preparation."

All in violation of Title 18, United States Code, Sections 1001(a)(2) & (c)(2), and 2.

31

**COUNT SEVEN**
18 U.S.C. §§ 1001(a)(2) & (c)(2), and 2
False Statement

91.     Paragraphs 1 to 90 of this Indictment are incorporated here by reference.

92.     On or about June 24, 2014, in the District of Columbia and elsewhere, in a matter

within the jurisdiction of the legislative branch of the Government of the United States, and in

connection with an investigation and review conducted pursuant to the authority of a committee

and office of the United States Congress, consistent with applicable rules of the House of

Representatives, defendant

**DAVID G. BOWSER**

did knowingly and willfully make a materially false, fictitious, and fraudulent statement and

representation, that is, during the course of an official investigation being conducted by the

Office of Congressional Ethics ("OCE"), defendant BOWSER made the following false and

misleading statement regarding the full nature, purpose, and extent of Brett O'Donnell's services

for Congressman A's campaigns:  "I mean, bottom line is this was done because [Congressman

A] significantly needed help in his communicating ability and that's the only reason why it was

done and, you know, we had no intention at all of doing anything on the political side with this."

All in violation of Title 18, United States Code, Sections 1001(a)(2) & (c)(2), and 2.

## COUNT EIGHT
18 U.S.C. §§ 1001(a)(2) & (c)(2), and 2
False Statement

93.     Paragraphs 1 to 92 of this Indictment are incorporated here by reference.

94.     On or about June 24, 2014, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, and in connection with an investigation and review conducted pursuant to the authority of a committee and office of the United States Congress, consistent with applicable rules of the House of Representatives, defendant

### DAVID G. BOWSER

did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation, that is, during the course of an official investigation being conducted by the Office of Congressional Ethics ("OCE"), defendant BOWSER made the following false and misleading statement regarding the full nature, purpose, and extent of Brett O'Donnell's services for Congressman A's campaigns:  completing and signing a "Request for Information Certification" provided to him by OCE in which he stated, "I certify that I have not knowingly and willfully withheld, redacted or otherwise altered any information requested in the Office of Congressional Ethics' ("OCE") Request for Information dated [June 9, 2014], or if I have withheld, redacted or otherwise altered any requested information, then I have identified the information and why it was withheld, redacted or otherwise altered."

All in violation of Title 18, United States Code, Sections 1001(a)(2) & (c)(2), and 2.

A TRUE BILL.


_____
FOREPERSON OF THE GRAND JURY


RAYMOND HULSER
Chief, Public Integrity Section

By: _____
Todd Gee
Sean F. Mulryne
Trial Attorneys
United States Department of Justice
Criminal Division
Public Integrity Section